**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **TYLER MASON, *Individual*** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO. 4:26-CV-02896** |
| **v.** | § | |
| | § | |
| **SOUTH TEXAS COLLEGE OF LAW HOUSTON, INC.,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| | § | |
| **Defendant,** | § | |

# FIRST AMENDED COMPLAINT

Plaintiff, Tyler Mason ("Plaintiff"), by and through his attorney, bring this action for damages and other legal and equitable relief from Defendant, South Texas College of Law Houston, Inc. ("Defendant"), for violations of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et. seq.* ("Title III"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et. seq.* ("Section 504"), and any other cause(s) of action that can be inferred from the facts set forth herein.

## TABLE OF CONTENTS


**I. INTRODUCTION** **2**
**II. JURISDICTION AND VENUE** **3**
**III. PARTIES** **3**
**IV. STATEMENT OF FACTS** **4**
**V. CAUSES OF ACTION** **25**
COUNT I 25
COUNT II 26
COUNT III 26
COUNT IV 27
COUNT V 28
COUNT VI 28
COUNT VII 29
COUNT VIII 30
COUNT IX 30
COUNT X 31
**PRAYER FOR RELIEF** **33**


## I. INTRODUCTION

1. This is an action brought by Plaintiff seeking damages from Defendant for acts of disability discrimination, and conversion of an approved "Withdrawal/Exit" into a false "academic dismissal" that Defendant then published to third parties. After receiving actual notice of Plaintiff's disabilities and accommodation requests, Defendant denied reasonable accommodations, failed to engage in a meaningful interactive process, retaliated against Plaintiff for protected activity, and disregarded its own withdrawal and academic-status procedures. Defendant's acts are in violation of Title III, Section 504, and any other cause(s) of action that can be inferred from the facts set forth therein.

2. The Plaintiff also alleges other causes of action that are grounded on state law and doctrines of common law, including breach of contract, and in the alternative, promissory estoppel, together with claims for fraud, defamation, tortious interference with prospective

business relations, and violations of the Texas Deceptive Trade Practices-Consumer Protection Act.

3. Plaintiff seeks declaratory relief, compensatory damages, punitive damages, special damages, emotional damages, attorneys' fees, costs, and all other relief the Court deems just and proper. Plaintiff does not seek reinstatement, readmission, continued enrollment, or any order requiring him to return to Defendant.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights and (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. §§ 2000e et seq., as amended.

5. The Court's supplemental jurisdiction is invoked under 28 U.S.C. § 1367(a), because all of Plaintiff's non-federal claims arise from a common nucleus of operative facts such that they form part of the same case or controversy as Plaintiff's federal claims.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendant maintains offices, conducts business and resides in this district, and because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## III. PARTIES

7. Plaintiff is and has been, at all relevant times, a citizen of the United States of America and is a resident of Ada County, Idaho. At all relevant times, Plaintiff was a student of Defendant, and therefore covered by Title III , and Section 504.

9. Defendant, South Texas College of Law Houston, Inc. is a Non-profit Corporation that operates business within the State of Texas and within the Southern District of Texas. Defendant operates its law school at 1303 San Jacinto St., Houston, Texas 77002. Upon information and belief, Defendant receives federal financial assistance and is a public accommodation.

10. During all relevant times, Defendant has been a private institution receiving federal funding and public accommodation covered by Title III, and Section 504. Defendant participates in the federal student financial aid programs authorized under Title IV of the Higher Education Act; its Student Handbook provides that federal loan and grant funds are applied to student accounts; and Defendant's own Withdrawal/Exit Form references the return-of-Title-IV funds requirements applicable to withdrawing students.

## IV. STATEMENT OF FACTS

11. Plaintiff is a person with a disability (as defined by the ADA and Section 504), who was previously a student enrolled in Defendant's Part Time/Online Juris Doctor program between about August, 2023 and May 28, 2024. Before enrollment, Plaintiff revealed to Defendant that he had Generalized Anxiety Disorder ("GAD") and Persistent Depressive Disorder ("PDD"), and provided documentation thereof. A February 2024 neuropsychological evaluation also identified that Plaintiff has Attention-Deficit/Hyperactivity Disorder ("ADHD"), with visual-memory deficits, and Social Anxiety Disorder ("SAD"). These conditions substantially limit major life activities including concentrating, reading, thinking, and memory, including the retrieval of memorized information.

12. Plaintiff had an undiagnosed disability and personal and financial difficulties that ultimately led him to attending multiple different institutions in the pursuit of his legal career. He commenced his higher education in about the summer of 2013, where he attended three different institutions before withdrawing. However, Plaintiff completed a Bachelor of Science in Criminal Justice at Boise State University in December 2020 with a 3.45 grade point average. Together with an associate's degree earned from Contra Costa Community College in San Pablo in December 2019, he completed his Bachelors in approximately two and one-half years. Prior to his enrollment with Defendant, Plaintiff was offered admission and scholarships ranging from seventy-five percent to full tuition at multiple law schools, including the University of Illinois at Chicago School of Law, Brooklyn Law School, Chicago-Kent College of Law, and the University of Akron School of Law. Plaintiff had attempted to enroll at two law schools in 2022 but withdrew from both due to disability-related complications and circumstances arising from the SARS-CoV-2 pandemic ("Covid-19").

13. Beginning in or around August, 2023, Plaintiff was subjected to explicit discrimination based on disability by Defendant and suffered significant harm, in which he lost all of his previously offered scholarships and law school admissions and any prospects towards gaining his legal career. Defendant failed to provide an accommodation for Plaintiff's memory retention disability and subjected him to a hostile educational environment, which kept Plaintiff at a disadvantage in his classes based on his disability. The selective implementation of accommodations by Defendant resulted in missed deadlines, increased stress, and adverse academic standing, disproportionately affecting Plaintiff compared to non-disabled students.

14. In December, 2025, FERPA disclosures revealed to Plaintiff for the first time internal communications among Student Services and other staff mocking Plaintiff's financial

status, disability-related requests, and academic standing, and sharing disparaging memes as is mentioned in paragraphs below. Communication and documents revealed through these FERPA disclosures are listed in the below paragraphs followed with “(FERPA Disclosures)”.

15. In or around May, 2023, Chandra Gonzalez (Senior Director of Student Services for Defendant), placed Plaintiff on financial aid probation after learning of an “Unusual Enrollment History” (“UEH”) flag on Plaintiff’s federal student aid record. Plaintiff disclosed his disabilities, GAD and PDD, with supporting documentation at this time in connection with his UEH financial-aid appeal. Ms. Gonzalez later cleared the UEH flag to permit disbursement of financial aid, but she cleared it with documented prejudice toward Plaintiff.

16. In or about August 2023, during the required orientation, Plaintiff met in person with Ms. Gonzalez to request a Cost-Of-Attendance (“COA”) budget increase for a transportation stipend for travel to and from work, citing the U.S. Department of Education's Federal Student Aid Handbook, which lists transportation as a component of COA. Ms. Gonzalez rejected Plaintiff’s request and stated, “It doesn't matter to me. You could be stuck all you want. I’m the institution,” before asserting that the only expenses the institution was required to cover were education-related expenses. Ms. Gonzalez asserted that transportation expenses could only be approved if they were “for the study,”, despite the COA for a university being based on living expenses to attend the school, including expenses for “transportation between school, residence, and place of work…”. (U.S. Dep't of Educ., Federal Student Aid Handbook, vol. 3, 33 (2023-2024)) Ms. Gonzalez failed to provide a valid justification or “professional judgment” for such rejection to Plaintiff’s COA increase request. (*See* U.S. Dep't of Educ., Federal Student Aid Handbook, vol. 3, 40 (2023-2024))

17. On September 18, 2023, during his first semester, Plaintiff submitted a written request to Defendant for examination accommodations and asserted his rights under the ADA.

18. The following day, September 19, 2023, in an internal email chain (FERPA Disclosures) that Defendant administrators captioned "Reasonable Accommodation, lawsuit?," Defendant personnel circulated advice stating that there was "no case until he applies for accommodations," that Plaintiff should be invited to apply, and that Defendant should then set up an "initial, interactive meeting." The "no case" advice came from an outside consultant, who identified herself as an "Independent Learning Specialist" and is not an attorney. In the same chain the consultant advised Defendant to escalate the matter to senior administration to "head off an inquiry, bad press," to act "ASAP to avoid lawsuits – regardless of how frivolous," and stated, "I wouldn't tip my hand. I wouldn't bring up attorneys."

19. On or about September 20, 2023, Mr. Fincham submitted a Campus Assessment, Response and Evaluation ("CARE") report regarding Plaintiff (FERPA Disclosures) that characterized Plaintiff's disability-related communications as "disorganized or erratic performance or behavior" and "ranting."

20. On September 26, 2023, Gonzalez emailed Associate Dean Derek Fincham (who oversaw Defendant's online program, and is a BARBRI student-success representative), stating that Plaintiff was "very familiar with the financial aid process"; that "if he stays enrolled until the 60% marker of the semester, he will not owe any loan funds back"; and that "if he has not been doing the work, and meeting the attendance minimum, it would be best to withdraw him from classes as soon as possible, rather than allowing him to continue… knowing he is trying to meet this date." (FERPA Disclosures) This email was sent within days of Plaintiff's accommodation discussions.

21. On or around October, 2023, Plaintiff submitted a special circumstance request to increase his COA after his laptop was stolen. On October 31, 2023, internal emails and chat logs (FERPA Disclosures) show that Christina Nutall (Assistant Director of Student Services for Defendant) and Ms. Gonzalez referred to Plaintiff as "at it again" regarding this simple financial aid request, and questioned the authenticity of the police report he provided, despite little or no actual evidence that showed it was fake.

22. On November 3, 2023, internal emails (FERPA Disclosures) show that Student Services for Defendant discussed denying Plaintiff's request for funds and Ms. Nutall mocked the cost of Plaintiff's laptop as a product of "boujie kids".

23. On or around November 13, 2023, Plaintiff submitted an official request to drop the zero-credit course, Intro to Legal Studies, with a Withdrawn Unsatisfactory ("WU"), before the applicable institutional deadline of November 20, 2023. Student Services confirmed that Plaintiff's request was submitted within the permissible timeline. Plaintiff's request remained pending in Derek Fincham's (Associate Dean Online Education & Innovation for Defendant) inbox for more than fourteen (14) days (FERPA Disclosures). After the deadline on November 29, 2023, Mr. Fincham denied the request, stating that it was "too late," notwithstanding Plaintiff's timely submission.

24. In a subsequent conversation with Plaintiff, Mr. Fincham recommended that Plaintiff seriously consider whether Plaintiff wanted to remain in the program and stated that law school "may not be for" Plaintiff, despite Plaintiff providing emergency and unexpected medical complications that reasonably justified the reason for his withdrawal of the course.

25. On December 4, 2023, Defendant's ADA/Section 504 Coordinator, Wanda Morrow, wrote to Plaintiff confirming receipt of his September 18, 2023 accommodation

concerns, asserted that Plaintiff had not formally "applied" for accommodations, and questioned how Plaintiff could appeal.

26. In a later communication in December 2023, the outside consultant or "Independent Learning Specialist" characterized Plaintiff to administrators as "very troubled." in internal communications (FERPA Disclosures). Despite this, Defendant adopted the consultant's recommendations, including a "case-by-case" response script the consultant drafted, which Assistant Dean Gena Singleton circulated as reflecting "Laura's wonderful suggestions."

27. In or around January, 2024, Plaintiff submitted a special circumstance request to increase his COA for specialized disability tutoring. Internal emails directed to Mr. Fincham (FERPA Disclosures) show that Student Services mocked Plaintiff's request for tutoring funding and declined his special circumstances request for this, stating "smh", an internet acronym for "shaking my head" often showing disapproval or frustration. This was denied despite COA including disability-related expenses, including "special services, personal assistance, transportation, equipment, and supplies that are reasonably incurred and not provided by other agencies." (U.S. Dep't of Educ., Federal Student Aid Handbook, vol. 3, 35 (2023-2024))

28. In or around February, 2024, Plaintiff underwent neuropsychological testing that confirmed his previous diagnoses of GAD and PDD and provided new diagnoses of ADHD and Other Specified Neurodevelopmental Disorder ("OSND"), specifically identifying severe visual memory deficits.

29. During a recorded intake meeting in early Spring 2024, Assistant Dean Garmond Duvernay acknowledged that Defendant's handling of Plaintiff's Fall 2023 Criminal Law final examination, which Plaintiff sat in following a contemporaneous emergency, had been incorrect,

and stated that, had Plaintiff been routed to the Office of Student Support, she "would have absolutely" advised him to reschedule the examination.

30. By February 13, 2024, Defendant knew that Plaintiff was seeking to transfer to another law school and that his transcript and letters of standing would be requested in connection with those applications.

31. On February 21, 2024, Associate Dean Maxine Goodman emailed Plaintiff stating that, even if Defendant granted Plaintiff's requested changes to his fall grades and standing, Plaintiff would "still be subject to the two-semester rule," under which he "will be automatically dismissed" absent a cumulative 2.300 grade point average after the spring semester, and asked Plaintiff to acknowledge that he understood the policy and "will not challenge" it. Plaintiff responded that one of the accommodations he was pursuing "could affect last semester as far as [his] academic probation," and that he did not want to acknowledge the school's position in a way that would cause him to "forfeit [his] rights" relating to that accommodation. After Plaintiff declined to provide the requested acknowledgment, Goodman denied his request to change his fall grades and academic standing.

32. In or around March, 2024, internal chat logs (FERPA Disclosures) show that Student Services, namely Ms. Nutall, Ms. Gonzalez, and Carla Beverly, mocked Plaintiff's bank balance, emergency aid request, GPA, and financial needs as they coordinated the denial of Plaintiff's reasonable requests. On March 6, 2024, in processing Plaintiff's request to advance funds from his Summer 2024 financial aid, Defendant staff acknowledged internally (FERPA Disclosures) that they understood Plaintiff to be transferring to another institution.

33. On or about March 19, 2024, Plaintiff submitted formal accommodation materials requesting (i) take-home or open-book examinations, (ii) fifty percent additional testing time,

and (iii) four additional disability-related absences per semester. The request was supported by two March 13, 2024 treating-provider letters—from Plaintiff's psychologist, Dr. Jason D. Gage, Ph.D., and his psychiatric-mental-health nurse practitioner, Gretchen Gayle, PMHNP, DNP—each recommending "take-home or open book exams," fifty percent extended time, and attendance leniency as accommodations under the ADA and Section 504. Ms. Gayle also recommended note-taking assistance. Plaintiff's March 19, 2024 submission included the complete February 14, 2024 neuropsychological evaluation, with its testing findings documenting the visual-memory deficit described above.

34. Plaintiff's submission included his written responses to Defendant's required accommodation questionnaire, which directed each applicant to identify the specific functional limitations substantially limiting a major life activity and, for each requested accommodation, a rationale tied to those limitations. Plaintiff supplied that information, connecting his documented limitations, including his memory-retrieval deficit, to each accommodation he sought.

35. On April 10, 2024, internal chat logs (FERPA Disclosures) show that Student Services, namely Ms. Nutall, instructed others to treat Plaintiff as a “problem student” with little or no justification for such a harsh status, suggesting retaliation for Plaintiff merely seeking proper accommodations via protected activity.

36. By written memorandum dated April 11, 2024, Defendant approved accommodations on a permanent basis: extended testing time (time plus fifty percent); a quiet test room with reduced distractions for on-campus testing; permission to bring Plaintiff's service dog to exam rooms, classrooms, and other school-related activities; permission to use an electronic device for note-taking purposes upon written notice; and permission to have Plaintiff's emotional support animal in the exam room for off-campus testing.

37. By emailed decision the same day, April 11, 2024, at 6:13 p.m., Assistant Dean Garmond-Duvernay denied the requested take-home or open-book examinations. This denial email addressed to Plaintiff described the accommodation under review as "Ability to Extended time: 10 minute 'stop-the-clock' extensions for each hour of testing", which was an accommodation Plaintiff had not requested. The same email stated a rationale addressing whether attention-deficit disorder "rises to the level of a qualified disability," although Defendant had approved Plaintiff's requested accommodations relating to his attention-deficit disorder that same day, and contained the name and disability evaluation information of a different student, including that student's age, prior degrees, evaluating psychologist, and an outside consultant's analysis of that student's documentation.

38. On April 15, 2024, at 5:30 p.m., Garmond-Duvernay re-sent the open-book and take-home examination denial. Then by emailed decision dated April 17, 2024, at 8:43 a.m., Garmond-Duvernay denied the requested additional disability-related absences, stating that "[a]ssociate deans, assistant deans, and professors do not have the authority to grant absences in excess of those allowed." Defendant did not provide the note-taking assistance Ms. Gayle recommended for students with disabilities.

39. On April 17, 2024, Plaintiff and Wanda Morrow (then Defendant's Assistant Dean of Institutional Compliance and International Programs and its Title IX and Section 504/ADA Coordinator), met by videoconference to address Plaintiff's appeal of the accommodation denial ("Appeal Meeting"). At that meeting, Morrow stated that the fifty percent additional testing time Defendant granted was "to allow to make up for that attention deficit." Plaintiff responded that additional time did not address his memory limitation: "even if I have the extra time, if I can't remember the elements, it's not worth anything," Morrow suggested Plaintiff watch online videos

to "increase [his] memory processing.", which implied that Plaintiff had not already been making similar efforts. In addressing the open-book denial, Morrow stated that "even though we've got the information from your medical provider suggesting that that would be helpful, ***we don't have to go beyond what would be a reasonable accommodation***."

40. At the same meeting, Plaintiff cited an article published in Defendant's South Texas Law Review: Donald H. Stone, *What Law Schools are Doing to Accommodate Students with Learning Disabilities*, 42 S. Tex. L. Rev. 19, which stated that "other testing methods such as paper submissions, take-home exams, or open-book exams should be allowed" as accommodations for students with disabilities. At the meeting, Morrow acknowledged that the materials Plaintiff submitted supported his position on take-home or open-book examinations, and stated, "***I'm not saying that it's an unreasonable accommodation.***" This completely contradicted her reasoning to deny Plaintiff's request for take-home or open-book exams.

41. Further Wanda Morrow (Assistant Dean and Title IX/ADA 504 Coordinator for Defendant) asserted during the appeals process that the request for open-book exams or a memory recall aid was denied because it would be a "material alteration" or "fundamental alteration" of the academic program. Ms. Morrow provided that this was because both of Plaintiff's professors stated that "they felt this would be an unfair advantage to other students for [Plaintiff] to have ***both*** extra time and open notes, open-book exams." However, when Plaintiff requested only a memory recall aid accommodation instead of additional testing time, Ms. Morrow denied this request without any interactive process.

42. Defendant denied Plaintiff's open-book request on the ground that it would provide "an unfair advantage" and materially alter the program, and Ms. Morrow stated that granting it would mean "setting a precedent… that could come back and be really a dangerous

one to have." Defendant's Student Handbook provides that no exception, waiver, or deviation "shall establish a new policy or create a binding precedent" (Student Handbook at 3). Ms. Morrow asserted again during the appeals process that a memory recall aid accommodation would “compromise essential learning outcomes”, despite neither of these professor’s course syllabus mentioning anything about learning outcomes or objectives for memory retrieval or memorization techniques and that they purely focused on analysis skills. (*Raymond v. Univ. of Hous.*, No. H-05-4149, 2009 U.S. Dist. LEXIS 112135 (S.D. Tex. 2009))

43. Ms. Morrow stated that only one of the two professors “said for pedagogical reasons, that would not be an appropriate way for that professor to effectively measure whether or not [Plaintiff has] mastered the skills of that course.” However, a memory recall aid accommodation was never approved or provided for Plaintiff in the second professor’s examination.

44. Open-book and open-note examinations are a recognized format at Defendant under the Student Handbook's final examination provisions (Student Handbook at 17–18), as Morrow acknowledged in stating that "some professors do allow open book." Ms. Morrow specifically identified Randall Kelso (Contracts Professor for Defendant) as one such professor. Plaintiff requested to take Mr. Kelso’s open-book Contracts I examination instead of his assigned professor’s Contracts I examination. Ms. Morrow denied this request and stated it would be a “terrible idea” and that she “can’t fathom” it. Ms. Morrow stated that doing so without sitting through the professor's class would be a "recipe for disaster," adding, "particularly if you have learning disabilities. I mean, come on now, Tyler, seriously." This completely dismissed an important aspect of discussion and a big question: due to Plaintiff’s memory deficit aspect of his disabilities and given the courses taught the same level of Contracts law, would Plaintiff taking a

different professor’s open-book exam actually have more barriers than taking his own professor’s exam in a closed-book format? Plaintiff maintains that the former would have less barriers, but discussion on this was never had.

45. Ms. Morrow continued dismissing Plaintiff’s disability and situation by questioning Plaintiff’s fitness for the legal profession, stating that in the practice of law one must be able to think on one’s feet without time to synthesize information and that Plaintiff might not remain enrolled if academic performance did not improve. However, the National Task Force on Lawyer Well-Being identified that licensed and practicing attorneys have a much higher rate of having similar mental health disabilities as Plaintiff (i.e. ADHD) than the average population, suggesting it is not a deterrent on its own.

46. Defendant's written inquiry to Plaintiff's professors, which Morrow read aloud at the meeting, did not disclose Plaintiff's memory-retrieval deficit or its clinical basis. When Plaintiff observed that the professors "were not made aware of the actual disability, the memory deficit," Morrow responded that it was "not their call to make" and that "this is the call of the disability services office and student support." That statement contradicted what Assistant Dean Garmond-Duvernay had told Plaintiff at the April 9 meeting — that open-book examinations were "truly a professor decision" and that "it's up to the professor discretion." Morrow also told Plaintiff, "this is not really a democracy when it comes to making these kinds of decisions." Plaintiff authorized Ms. Morrow to disclose Plaintiff’s specific memory-deficit diagnosis to faculty for purposes of evaluating the accommodation request further. Ms. Morrow refused to disclose the memory-deficit diagnosis to faculty and stated that it was “not their call to make,” preventing faculty from understanding the clinical necessity of the requested accommodation.

47. On the requested disability-related absences, Garmond-Duvernay (at an April 9 meeting) and Morrow (at the April 17 appeal meeting) grounded the denial in ABA attendance rules. Assistant Dean Garmond-Duvernay told Plaintiff that, "because of the ABA, we can't allow additional absences." Morrow also stated that "the ABA has rules regarding attendance" and that "the ABA rule is 75%." When Plaintiff responded that the ABA had abolished "the rule of 75%/25%," Morrow shifted her stated basis, replying, "Under the Americans with Disabilities Act, not the ABA, the ADA." Morrow told Plaintiff that Defendant had "no provision" for disability-related absence accommodations under the ADA and instructed him to "save" his absences. Morrow further stated that she was "not aware" of any ADA protection for disability-related absences equivalent to the protections she acknowledged applied to pregnant students under Title IX, despite these types of absences being reasonable modifications for students with anxiety disorders under Section 504.

48. Defendant's written appeal decision dated April 19, 2024 denied the take-home and open-book examination accommodations and the additional disability-related absences. The decision stated that Defendant had "spoke[n] with an outside consultant and the relevant faculty members," and denied the examination accommodation on the grounds that open-book access "would not allow an adequate assessment of learning outcomes," "would be a fundamental alteration of the course's essential nature and content," and "would also constitute an unfair advantage for a single student." It denied the absence accommodation on the grounds that Plaintiff's online classes "enable [him] to attend class remotely" and that additional absences "would not be in [his] best interests as a student who is already struggling academically."

49. On April 19, 2024, internal chat logs (FERPA Disclosures) show that Student Services, namely Ms. Nutall, stated “bully them not me” in regards to simple requests from Plaintiff with little or no evidence that Plaintiff was “bullying” or antagonizing staff.

50. At a recorded April 24, 2024 meeting, Assistant Dean Garmond Duvernay described Defendant's accommodation-review process to Plaintiff: "it's a fundamental alteration, so it is one that we do an individualized inquiry on." This would again suggest that such memory recall aid is a possible accommodation for Plaintiff in this process.

51. At the same recorded April 24, 2024 meeting with Associate Dean Goodman and Assistant Dean Garmond-Duvernay, Plaintiff proposed dropping current courses and restarting in the Fall while working on vocational rehabilitation. Garmond Duvernay responded that, because Plaintiff had already completed certain courses that semester, he "wouldn't be able to fully withdraw," could withdraw only from a couple of classes, and that doing so "would still count as you have completed a second semester" for purposes of the two-semester rule. By late spring 2024, Plaintiff decided to withdraw from Defendant and not return.

52. On or about May 22, 2024, Plaintiff submitted to Defendant a written request for a reasonable accommodation in the form of an exception to the Two-Semester Rule, supported by documentation from his treating providers and by a faculty member. Defendant denied the request. Associate Dean Goodman had told Plaintiff that there was "no right of appeal" from the Two-Semester Rule, although Defendant had granted exceptions in the past, including allowing a student dismissed under the rule to reapply after one year rather than two, where, in Goodman's words, "the work had been done."

53. Internal correspondence dated January 24, 2024 (FERPA disclosures), showed that Defendant supported another student’s request to restart the program as a new student in the

Fall. Gena Singleton (Assistant Dean for Defendant) advocated that the other student be permitted to restart without reapplying through admissions, citing “extenuating circumstances” and “mental health.” This contrasts Garamond Duvernay statements provided in the April 24, 2024 meeting about restarting in the fall.

54. On May 25, 2024, Plaintiff submitted Defendant’s official and digital Withdrawal/Exit form. While the request was initiated through the summer course interface, Plaintiff explicitly utilized the 'Exit' provision of the form to indicate he would not be returning to the institution as it was "not a good fit," providing written justification to exit from both the 2024 spring and summer terms prior to the release of 2024 Spring grades. For a "Withdrawal Without Academic Prejudice", the form requires the student to elect whether he will return. Plaintiff elected that he would not return and requested a Withdrawal Without Academic Prejudice.

55. On May 28, 2024, the Withdrawal/Exit was approved by Ms. Garmond-Duvernay at approximately 10:29 a.m., processed by Maria Burris (Assistant Director of Student Services for Defendant) at approximately 3:04 p.m., and routed through Ms. Gonzalez at approximately 3:13 p.m. Under the Student Handbook, students who withdraw with no intent to return have STANLEY and email access immediately turned off. Plaintiff's access was turned off immediately upon this approval of his withdrawal. This concluded their contractual relationship before 2024 Spring grades were released.

56. On May 31, 2024, Gonzalez emailed Defendant's Senior Director of Information Systems, George Milz, and IT staff member Phi Le: "He was a student who withdrew, not returning.. But we need to send him a final dismissal letter. Can you turn on his access for the next 3 weeks, please?" Defendant's IT staff reactivated Plaintiff's previously deactivated account

"for the next 3 weeks." However, the fact that Plaintiff successfully *withdrew/exit* “with no intent to return” from enrollment with Defendant for the Spring and Summer terms, rendered Defendant contractually unable to make this change via Defendant’s Student Handbook. By formally approving and processing Plaintiff’s Withdrawal/Exit on May 28, 2024, Defendant waived any further administrative jurisdiction to take academic action against Plaintiff.

57. Plaintiff's Spring 2024 grades were not posted until June 6, 2024. The Student Handbook provides that "each student's average will be computed after all final grades are posted for each semester or session to determine academic probation and dismissal" (Student Handbook at 23), and the academic calendar set the Spring 2024 grade deadline at June 6, 2024 (Student Handbook at 1). The Two-Semester Rule applies only when a student fails to achieve a cumulative 2.300 grade point average after the first two long semesters. Defendant's May 31, 2024 email directing a dismissal letter preceded the posting of the grades on which any dismissal under that rule would depend.

58. The Student Handbook's Student Code of Conduct provides that "[t]his Code shall apply to a student's conduct even if the student withdraws or is dismissed… while a disciplinary matter is pending" (Student Handbook at 39). No disciplinary matter was pending against Plaintiff at the time of his withdrawal.

59. On about June 10, 2024, Ms. Gonzalez documented her review of Plaintiff’s remotely proctored examination videos for Torts and Contracts in an internal email, in which Ms. Gonzalez acknowledged that no video was uploaded for the Contracts examination. Despite the absence of video evidence for Contracts, Ms. Gonzalez made conclusions of Plaintiff’s navigation patterns and behavior as if there was a video and provided that it “leads us to believe he was using outside materials or a 2nd device.”

60. In the same June 10, 2024 email, Gonzalez wrote that, had Plaintiff "not already been academically dismissed," she "would have submitted him to the academic misconduct board for review of cheating." Defendant did not submit the allegation to that board, did not charge Plaintiff with misconduct, and did not provide him notice or a hearing, declining to pursue the allegation through any adjudicative process because it had already recorded the dismissal.

61. On June 12, 2024, Defendant issued Plaintiff a letter stating that he had been "DISMISSED FOR ACADEMIC DEFICIENCY effective immediately," that he had been administratively dropped from his summer 2024 course, despite the fact that Plaintiff had already withdrawn and was not enrolled in any summer 2024 course. The letter further provided that he could apply for readmission only as a beginning student after two years. Although the letter recited the Handbook's 2.300 requirement, it stated no grade point average that Plaintiff had actually received, and made no reference to his approved Withdrawal/Exit. The Student Handbook provided a procedure under which Defendant's Student Appeals and Disciplinary Committee could hear "irregularities or errors in interpreting or implementing" the Academic Deficiency policy (Student Handbook at 37). Defendant afforded Plaintiff no notice, no hearing, and no opportunity to invoke that or any other published procedure before recording the dismissal.

62. On June 13, 2024, Goodman emailed Plaintiff stating that Defendant had "reviewed the forensics analysis on Examsoft for both exams," that it "saw irregularities on the recording where [Plaintiff] appeared to be looking at another screen (which we will continue to investigate)," that "there's no evidence to suggest [his] exams were impacted by any technical issues," and that Plaintiff's "academic dismissal stands."

63. The Student Handbook's "Reporting Exam Misconduct" provision directs that violations "should be immediately reported to stcl.edu/misconductreport," and Defendant maintains a separate process, including notice and a hearing before its academic misconduct board, for adjudicating such allegations. Defendant invoked none of that process, yet relied on the suspected irregularities in maintaining Plaintiff's dismissal and declining the accommodation that would have allowed him to continue.

64. On June 20, 2025, Gonzalez signed and transmitted a letter of standing to San Joaquin College of Law stating that Plaintiff " completed 14 semester hours with an overall grade point average of 1.381 and was finally dismissed for academic deficiency," and that Plaintiff "has no standing at this time." The letter made no mention of Plaintiff's approved Withdrawal/Exit.

65. Plaintiff later applied to other law schools. He authorized release of his official academic records to LSAC and, where a school did not use that service, through a third-party transcript service, and signed releases authorizing Defendant to send letters of standing, as required by the application. The written authorizations authorized Defendant only to make available his existing educational records to a specified recipient. Those authorizations extended only to Plaintiff’s records as they existed; they did not authorize the creation or alteration of any record.

66. Plaintiff authorized these disclosures in reliance on the accuracy of his records and disclosed in his application materials that he had withdrawn from Defendant. Although Plaintiff was aware that Defendant's records reflected a "Dismissed for Academic Deficiency" status, he understood that designation to be false in light of Defendant's prior approval of his Withdrawal/Exit.

67. Plaintiff did not learn that the dismissal designation had been created after Defendant approved his Withdrawal/Exit, through the reactivation of his deactivated account described above, until he received his FERPA disclosure in December 2025. Before that disclosure, Plaintiff neither knew nor had any means of knowing that the designation had been created after his approved withdrawal, because the internal records showing its creation were exclusively in Defendant's possession.

68. LSAC's Credential Assembly Service transmitted Plaintiff's report to Washburn University School of Law on October 17, 2025. On December 19, 2025, the Equal Opportunity Director of Washburn University, responding to Plaintiff's ADA and Section 504 grievance regarding the Washburn School of Law admissions decision, stated that the transcript from Defendant "indicated that you were academically dismissed" and that this factor was "taken into consideration to determine whether you would be admitted," and noted the discrepancy between Plaintiff's self-reported withdrawal and the dismissal designation on Defendant's transcript

69. Defendant published Plaintiff's academic status to LSAC, to law schools to which Plaintiff applied, and to institutions that requested letters of standing. Directly due to Defendant's unauthorized reporting of a "Dismissal" status instead of the processed Withdrawal/Exit to other institutions, Plaintiff has received seventeen (17) rejections from other law schools, a few of which plaintiff has been admitted to previously.

70. To the best of Plaintiff's knowledge, LSAC's Credential Assembly Service ("CAS") prepares a separate report for each law school to which an applicant applies; each school requests the report directly from LSAC, and the report includes copies of the applicant's law school transcripts. CAS reports are not published to the public: each report is released only to the requesting school, and only after LSAC's release conditions are satisfied. Each report to

each school is a separate, recipient-specific transmission, and LSAC transmits updated reports when the underlying records change.

71. Defendant transmitted letters of standing reflecting a "Dismissed for Academic Deficiency" status to third parties, including other law schools, in May 2025 and June 2025. Each transmission was a separate publication, and each occurred within the one-year period preceding the filing of this action. The status remains within Defendant's records and has continued to be disseminated on third-party record requests.

72. After leaving Defendant, Plaintiff earned a 3.39 grade point average in Juris Master coursework at Antonin Scalia Law School; a 3.84 final-term and 3.36 cumulative grade point average in an ABA-approved Paralegal Certificate program at the University of San Diego School of Law; and currently maintains a 4.0 grade point average in a Master of Business Administration program. In those programs, examinations were administered in open-book format or functionally equivalent conditions for reasonable accommodations. Plaintiff also scored 336 on the Graduate Record Examination in Fall 2021 and 331 in Fall 2025. Each of these subsequent admissions and programs was to a non-J.D. program; admission to a Juris Doctor program remains Plaintiff's objective.

73. At the recorded April 24, 2024 meeting, Goodman had stated that "there have been situations… in my tenure where instead of two years, we allowed someone who was academically dismissed under the two-semester rule to sit out and reapply after one year," describing the exception as warranted where "the work had been done" during the period of separation. Thus, in or about November 2025, Plaintiff requested early readmission to Defendant, presenting his subsequent academic record and the personal work he had done on himself. Assistant Dean of Admissions Alicia Cramer advised Plaintiff on November 18, 2025

that this was not "a decision [she] make[s] unilaterally" and that she had "reached out to the appropriate parties for feedback." On November 19, 2025, Cramer informed Plaintiff that "it has been determined" Defendant "will not be making an exception to our 2-year rule." Plaintiff sought readmission at a time when he did not yet know that the dismissal designation had been created after his approved withdrawal. Defendant's application of its two-year reapplication rule to Plaintiff in November 2025 reflects its continued maintenance and enforcement of the recorded dismissal.

74. Changes to federal student-aid law effective July 1, 2026 impose lifetime borrowing limits. Plaintiff has continued to apply to law schools and to earn additional academic credentials. The "Dismissed for Academic Deficiency" designation that Defendant maintains and continues to transmit has remained an obstacle to his admission and to his completion of a legal education. Each of Plaintiff's applications for admission to a Juris Doctor program submitted while the dismissal status remained in his records has been denied. As applied to Plaintiff, the borrowing limits now substantially impair his ability to finance a Juris Doctor program. The dismissal status remains in Plaintiff's records and continues to be reported, and it will accompany any future application for admission, licensure, or employment that requires his academic records.

75. Defendant's conduct during Plaintiff's enrollment, including the internal communications described above created a hostile educational environment, causing Plaintiff emotional distress, including insomnia, panic attacks, weight fluctuations, and gastrointestinal symptoms. As a direct and proximate result of Defendant's retaliation and fraud relating to disclosing the false academic dismissal, Plaintiff suffered lost educational and professional opportunities, lost admissions and scholarships, injury to reputation, and mental anguish. The

December 2025 FERPA disclosures revealed to Plaintiff the full scope of the cause of his damages.

## V. CAUSES OF ACTION

### COUNT I

### Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*

### (Discrimination)

76. Plaintiff is a qualified individual with a disability and repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

77. Defendant is a private educational institution and a place of public accommodation as defined under 42 U.S.C. § 12181(7)(J), with actual knowledge of Plaintiff's disability.

78. Defendant denied reasonable accommodations which Plaintiff requested to address his documented functional limitations, in particular the take-home, open-book, or cue cards, examination format for his visual memory-retrieval deficit. Defendant failed to participate in an interactive process for such accommodations, and refused to provide reasonable attendance flexibility for his disability.

79. The conduct alleged herein violates Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*, as Defendant has engaged in the practice of discrimination with respect to Plaintiff's full and equal enjoyment of Defendant's educational services, programs, and privileges, and denied reasonable modifications to policies, practices, and procedures necessary to afford Plaintiff equal access to Defendant's academic programs.

80. Plaintiff requests for relief as set forth below.

**COUNT II**

**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.***

**(Discrimination)**

81. Plaintiff is a qualified individual with a disability and repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

82. Defendant is a private educational institution and a place of public accommodation with actual knowledge of Plaintiff's disability.

83. Defendant denied reasonable accommodations which Plaintiff requested to address his documented functional limitations, in particular the take-home, open-book, or cue cards, examination format for his visual memory-retrieval deficit. Defendant failed to participate in an interactive process for such accommodations, and refused to provide reasonable attendance flexibility for his disability.

84. The conduct alleged herein violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, as Defendant has engaged in the practice of discrimination with respect to Plaintiff's full and equal enjoyment of Defendant's educational services, programs, and privileges solely by reason of Plaintiff's disability, and denied reasonable modifications to policies, practices, and procedures necessary to afford Plaintiff equal access to Defendant's academic programs.

85. Plaintiff requests for relief as set forth below.

**COUNT III**

**Title III of the Americans with Disabilities Act, 42 U.S.C. § 12203**

**(Retaliation)**

86. Plaintiff is a qualified individual with a disability and repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

87. Plaintiff engaged in protected activity by requesting accommodations, opposing disability discrimination, and asserting rights under the ADA, which followed with Defendant's adverse actions. A causal connection exists between Plaintiff's protected activity and Defendant's adverse actions, as shown by temporal proximity of dismissive and hostile internal communications regarding Plaintiff, Defendant's recording of an academic dismissal of Plaintiff, and the time with which Plaintiff sought accommodations and academic support.

88. The conduct alleged herein violates Title III of the Americans with Disabilities Act, 42 U.S.C. § 12203, as Defendant has taken adverse actions with respect to Plaintiff's engagement in protected activity.

89. Plaintiff requests for relief as set forth below.

**COUNT IV**

**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et. seq*.**

**(Retaliation)**

90. Plaintiff is a qualified individual with a disability and repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

91. Plaintiff engaged in protected activity by requesting accommodations, opposing disability discrimination, and asserting rights under the ADA, which followed with Defendant's adverse actions. A causal connection exists between Plaintiff's protected activity and Defendant's adverse actions, as shown by temporal proximity of dismissive and hostile internal communications regarding Plaintiff, Defendant's recording of an academic dismissal of Plaintiff, and the time with which Plaintiff sought accommodations and academic support.

92. The conduct alleged herein violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, as Defendant has taken adverse actions with respect to Plaintiff's engagement in protected activity.

93. Plaintiff requests for relief as set forth below.

**COUNT V**

**Breach of Contract**

94. Plaintiff repeats and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

95. Defendant's Student Handbook, Academic Policies, Catalogs, Enrollment Agreements, and relationship with Plaintiff create an implied contract given consideration of Plaintiff paying tuition and fees to Defendant in exchange for educational services and support.

96. Defendant's Withdrawal/Exit form, which Defendant required Plaintiff to submit and which Defendant approved, independently provides, in mandatory terms, that a Withdrawal Without Academic Prejudice "will be granted" for up to two calendar years from the last term attended, and it contains no disclaimer, reservation, or merger clause. This is an agreement to end the implied contract with a withdrawal and not a dismissal.

97. Defendant materially breached this implied contract by failing to maintain the withdrawal/exit status of Plaintiff at Defendant as an end to their implied contract.

98. Plaintiff requests for relief as set forth below.

**COUNT VI**

**Promissory Estoppel**

99. Plaintiff repeats and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

100. Defendant made a clear and definite promise that a Withdrawal Without Academic Prejudice "will be granted" for up to two calendar years from the last term attended upon the approval of Defendant's Withdrawal/Exit form submitted by Plaintiff. Plaintiff relied on the approval for such promise to his detriment, when Defendant changed his status to an academic dismissal and shared it with LSAC and other law schools.

101. Defendant made clear and definite promises regarding accommodations, fair treatment, and procedural protections, which Plaintiff reasonably relied on to his detriment when Defendant failed to provide fair treatment and proper accommodations.

102. Plaintiff requests for relief as set forth below.

**COUNT VII**

**Defamation**

103. Plaintiff repeats and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

104. Defendant caused actual harm when they published false statements of fact concerning Plaintiff by knowingly providing the false statement that Plaintiff was academically dismissed from Defendant for academic deficiency to third parties, including LSAC and other law schools. These publications were false, unprivileged and made with negligence or actual malice given that Plaintiff submitted and was approved for a withdrawal without prejudice.

105. The false statement that Plaintiff was dismissed for academic deficiency is defamatory per se, because it tends to injure Plaintiff in his chosen profession and impugns his fitness to pursue the practice of law. Third parties received, considered, and acted upon the publication in evaluating Plaintiff's applications and in denying Plaintiff admission or other educational opportunities.

106. Plaintiff requests for relief as set forth below.

**COUNT VIII**

**Fraud by Nondisclosure and, in the Alternative, Common Law Fraud**

107. Plaintiff repeats and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

108. Defendant caused actual harm when they made a false material representation that Plaintiff's status was a "Withdrawal Without Academic Prejudice", with reckless disregard for the truth. Defendant made the representation with the intention that Plaintiff act in reliance on it, specifically, that Plaintiff accept and proceed under the Withdrawal Without Academic Prejudice status rather than pursue other protections then available to him. Plaintiff's reliance was reasonable: Defendant's representation was definite, no express written term between the parties contradicted it, and Defendant possessed exclusive knowledge of its own internal intentions and processes concerning Plaintiff's status.

109. Defendant deliberately failed to disclose the reactivation and conversion. Plaintiff was ignorant of these facts and had no equal opportunity to discover them, as they were effected internally and were not disclosed to Plaintiff until Defendant produced its records in response to Plaintiff's FERPA request on or about December 19, 2025. Plaintiff relied on Defendant's silence to his detriment.

110. Plaintiff actually relied on this misrepresentation, such that Plaintiff requests for relief as set forth below.

**COUNT IX**

**Tortious Interference with Prospective Business Relations**

111. Plaintiff repeats and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

112. Plaintiff had applied, or was in the process of applying, for admission to approximately twenty (20) accredited law schools, and each such application created a prospective business and contractual relationship between Plaintiff and the institution within the meaning of Texas law.

113. Plaintiff's true status, an approved Withdrawal Without Academic Prejudice, would not have precluded admission. Defendant acted with knowledge that such interference was substantially certain to result because Defendant knew by March 6, 2024 that Plaintiff intended to transfer to and enroll at other law schools. Defendant thereafter knowingly created a false academic record by reactivating Plaintiff's account and converting his approved Withdrawal/Exit into a "dismissed for academic deficiency" status before final grades were released.

114. Defendant's deliberate actions caused Plaintiff actual harm because Defendant's false academic dismissal led to Plaintiff's denied admission to those institutions, losing the prospective educational and professional relationships.

115. Plaintiff requests for relief as set forth below.

**COUNT X**

**Violations of the Texas Deceptive Trade Practices, Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 *et seq.***

116. Plaintiff repeats and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

117. Plaintiff is a "consumer" and "person" as defined by Tex. Bus. & Com. Code § 17.45: he sought and acquired, by purchase, educational services from Defendant, paying tuition and fees financed in substantial part through federal student loans.

118. Plaintiff gave Defendant written notice of this claim in compliance with Tex. Bus. & Com. Code § 17.505 by counsel's demand letter dated, March 20, 2026, sent by email and certified mail more than sixty days before this First Amended Complaint was filed, itemizing his damages and expenses.

119. In connection with the sale of its educational services, Defendant engaged in false, misleading, and deceptive acts and practices in violation of Tex. Bus. & Com. Code § 17.46(b), by the following: First, representing that its services and the agreements governing them, including the published withdrawal process and the approved Withdrawal Without Academic Prejudice, conferred or involved rights, remedies, and characteristics that they did not, under Tex. Bus. & Com. Code § 17.46(b)(5), (12), by approving Plaintiff's withdrawal under its published process and thereafter recording and communicating a status of "Dismissed for Academic Deficiency" in its place. Second, representing to Plaintiff that his exit was governed by the withdrawal he applied for and was granted, while recording and publishing a contrary status. Finally, thereafter republishing that status as fact to LSAC and, through it, to more than twenty law schools, and maintaining it through to the present.

120. Each such representation was an express misrepresentation of material fact that cannot be characterized as advice, judgment, or opinion. Defendant's conduct was committed "knowingly" and "intentionally", given that on May 31, 2024, Defendant made a request to reactivate Plaintiff's account so that a dismissal letter could be sent despite actual awareness that the approved withdrawal existed. Plaintiff relied to his detriment on Defendant's representations

that his exit was governed by the approved Withdrawal Without Academic Prejudice, completing his exit from the institution in reliance on that approved status before Defendant issued the June 12, 2024 letter.

121. Plaintiff requests for relief as set forth below.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgement against Defendants as follows:

A. A judgment declaring that the practices complained of herein are unlawful and in violation of Section 504 of the Rehabilitation Act, Title III of the Americans with Disabilities Act, and applicable Texas law;

B. All damages which Plaintiff has sustained as a result of Defendant's conduct where allowed by law, including statutory damages, front pay, loss of or diminished earning capacity, lost lifetime earnings, benefits, general and specific damages for lost financial aid and tuition reimbursement, and benefits he would have received but for Defendant's discriminatory practices, and for emotional distress, humiliation, embarrassment, and anguish;

C. Treble damages upon the findings of knowing and intentional conduct under Tex. Bus. & Com. Code § 17.50(b)(1);

D. Exemplary and punitive damages in an amount commensurate with Defendant's ability and so as to deter future malicious, reckless, and/or intentional conduct where allowed by law;

E. Awarding Plaintiff the costs and disbursements incurred in connection with this action, including reasonable attorney's fees, expert witness fees and other costs;

F. Pre-judgment and post-judgment interest, as provided by law;

G. Granting Plaintiff's other and further relief as this Court finds necessary and proper.

Plaintiff also seek injunctive relief, including, but not limited to:

A. Restoration of academic standing, including but not limited to changing Plaintiff's status at Defendant's institution as "Withdraw/exit" instead of a "Dismissal";

B. Defendant to correct the false "Dismissed for Academic Deficiency" designation in records within its control and to cease further dissemination of that designation;

C. Training on the subject of disability discrimination for all of Defendant's employees;

D. Placement of professional(s) with a background in psychiatry and/or psychology to review all students' requested mental health related disability accommodations;

E. Supervisory discipline up to and including termination for any supervisor who engages in unlawful discrimination;

F. Active monitoring of the work areas to ensure compliance with discrimination policies;

G. That the Court retain jurisdiction over Defendant until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law.

Plaintiff further demands that they be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Dated: July 21, 2026

Respectfully submitted,

/s/ Ringo M.K. Bosley
Ringo M.K. Bosley
Attorney At Law
Fed. No. 3904719
SBN: 24130072

**Ringo Legal, PLLC**

801 Travis St. Suite 2101, PMB 2211
Houston, TX 77002
hello@ringobosley.com
832-280-5773
Attorney for Plaintiff